IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FILED
SEP 0 9 2016
CLERK OF COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DONNA NICHOLSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-CV-1369 |
| | ) |
| THE CITY OF PEORIA, ILLINOIS, | ) |
| a municipal corporation, and STEVEN | ) |
| SETTINGSGAARD, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION TO RECONSIDER**

Plaintiff requests a Motion to Reconsider in the ruling and order entered by Honorable Judge Mihm dated 8/12/16 where the Defendants' Motion for Summary Judgment was granted.

This Motion to Reconsider is based on the following facts:

In summary, Plaintiff was responsible for millions of dollars in her position of Asset Forfeiture, she got in the way of former Chief Steven Settingsgaard spending the money illegally, improperly and with poor judgment. Chief Steven Settingsgaard replaced her with someone unqualified, who wouldn't get in the way. The monies were spent illegally. The previous investigation is relevant to these proceedings and was covered up by the police administration at a great expense to taxpayers. The Asset Forfeiture monies are gone with barely any money or assets coming in. Chief Steven Settingsgaard left the Peoria Police Department and is now employed by Caterpillar, Inc.

This case is a collection of years of new and old evidence which is all related and has substance to prove beyond reasonable doubt the claims set forth in this case.

This case has been handled improperly, illegally and unprofessionally. The mere fact that Officer Jeffrey Wilson was never disciplined or terminated each time he was caught secretly video recording a female should be a red flag in and of itself. One would ask for what purpose was a male officer allowed to do this conduct to a female officer repeatedly over the span of several years with several different cameras? For what purpose was the investigation kept inside the Peoria Police Department under Chief Settingsgaard and not taken to an outside agency? For what purpose was Officer Wilson allowed to lie about it under oath, on the stand and in the internal investigation without consequences? For what purpose is this still an unsolved case at the Peoria Police Department? For what purpose did the City of Peoria pay the defense lawyers approximately $100,000.00 of tax payer money to defend Officer Wilson (in a stalking order of protection sought and awarded justifiably by the Plaintiff) **when clearly the union contract does not provide that financial representation**? For what purpose was the City of Peoria allowed to go on a witch hunt on the Plaintiff? For what purpose is Officer Wilson still employed by the Peoria Police Department? For what purpose is the current Peoria Police Administration presently looking at giving Officer Wilson full disability for the remainder of his career?

The answers are all related and connected to this case. The following incidences and occurrences all happened because Chief Settingsgaard wanted total control to spend the large balances in the Asset Forfeiture accounts any way he wanted and he, indeed, was behind the illegal video recordings, the illegal GPS, the illegal cover-up of the investigation, the illegal targeting, the illegal discrimination, the illegal retaliation and because any female who questioned Chief Settingsgaard was punished severely – more so than any male officers. The reason for the illegal GPS on the Plaintiff's vehicle was to "hunt" for a reason to have her removed from being in the way of the money. Not only did they not find a reason, but it backfired on them when they were caught and then the 6 year cover-up began.

Evidence will show there was never any personal relationship between Plaintiff and Officer Wilson. They were simply co-workers. Evidence will show Chief Steven Settingsgaard has fired other officers for being untruthful in internal investigations.

Evidence will show and support that Plaintiff was responsible for over $11,000,000.00 worth of assets in 10 years of being the Asset Forfeiture investigator. Over 6.6+ million was from 3000 Asset Forfeiture cases and over 4.3+ million was from the impound program the Plaintiff started from the ground up. The Asset Forfeiture position is a highly specialized position that requires intense training, dedication and hard work, not just for successful cases coming in, but also for monies going out so that monies are being spent appropriately and legally. Evidence will show Plaintiff was removed <u>for doing her job</u> and not allowing the money to be spent illegally. The illegal videos and illegal GPS activities being done to her were just the beginning of an attempt to "witch hunt" to find a reason to have her removed. This backfired on Chief Settingsgaard, hence why everything was handled inappropriately. The Plaintiff has been fighting the deep pockets of the City of Peoria for years to get justice. This isn't a case of what did the Plaintiff do wrong. It is a case of what the Defendants have spent years covering up.

Evidence attached will additionally show that there are e-mails going back and forth from Plaintiff to Chief Settingsgaard at the end of 2011 where the Chief wanted to spend money from the Asset Forfeiture funds on rope houses and Plaintiff told him it was impermissible spending and someone would go to prison. In summary, the Chief wanted to know if anybody actually checked on the spending of the accounts, if audits were done and if Plaintiff could site any cases in which someone had been caught. In the same series of e-mails, Chief Settingsgaard would go around Plaintiff to other people to see if he could get a different answer. Unfortunately for Chief Settingsgaard, the Asset Forfeiture answers were always the same. Shortly after this, new (callous) supervisors were assigned to Plaintiff and approximately 6 months later, the new

"rotation policy" was created where now all of a sudden Plaintiff's specialized position was up for rotation.

Evidence will show that since the Plaintiff was removed from the position, the money is almost completely dried up, there is very little money coming in <u>and the monies were indeed spent inappropriately and illegally by Chief Settingsgaard and his administration</u>. Plaintiff has FOIA'd not only Officer Troy Skaggs' case load and training, but also the expenditures of the Asset Forfeiture accounts and the balances of the accounts. There is an enormous paper trail. Plaintiff called for an audit by State Police but because of budget cuts, lack of personnel and lack of funding, the State was unable to provide an audit.

Additionally, Officer Jeffrey Wilson has gone to the media and admitted that he worked directly for Chief Settingsgaard (bypassing the chain of command) and Chief Settingsgaard indeed had him putting GPS's on employee's vehicles and Chief Settingsgaard also had Officer Wilson put hidden video recording cameras inside offices at City Hall of the City of Peoria. In the beginning years of this case, Chief Settingsgaard had to keep Officer Wilson employed or Officer Wilson was going to tell on Chief Settingsgaard. When Officer Wilson was removed from the Vice office (for secretly illegally video recording Plaintiff again) and sent to patrol, he made comments that "he wasn't going down alone."

Troy Skaggs, who was the Union President until 2013, and others on the Union Board agreed to the "new rotation policy" without taking it to the membership for a vote. The rotation policy was put into place and suspiciously the Asset Forfeiture position was now part of rotation. Ironically, Troy Skaggs, the Union President who agreed to the rotation policy, got the Plaintiff's Asset Forfeiture position and several other Union Board members were given positions in the "new" Target Offender Unit. Suspiciously the Plaintiff was the only one removed from the

SID/vice unit. Suspiciously no one in the whole department who lost their positions had any close ties to the Chief. Coincidence or convenient?

Before Plaintiff even gave her interview in 2012, she was told to box up her asset forfeiture files that were in filing cabinets by her desk because they were going to be moved to storage. Shortly thereafter, unbeknownst to the Plaintiff, the Plaintiff came into work one day in fall 2012 and the Plaintiff's desk was moved to a different place in the room. This was also before the interviews. The "new rotation policy" had already been announced on paper that her position was subject to being rotated. The Plaintiff knew by her treatment (as documented in the 2012 complaint to IDHR) she was on the "chopping block". This helps show the decision was made before the interviews were even conducted as Lt. Kerrie Davis testified to in her federal deposition.

Captain Lisa Snow was not in charge of SID at the time of the interviews and was suspiciously put in the interview room on the "interview panel" in 2012 but not (then) Sgt. Kerrie Davis who was going to be the direct supervisor of Asset Forfeiture. This is not a common practice at all at the Peoria Police Department. No one from the Peoria Police Department, who was on the "interview panel" when Plaintiff applied for her position, is an expert in asset forfeiture. The only person, other than the Plaintiff, who is an expert of the Peoria Police Asset Forfeiture positions for over 20 years, is the Appellate Prosecutor, Kim Nuss, who gave an affidavit in this case. Kim Nuss' assessment is completely relevant to this case. <u>Kim Nuss is the only other expert in Asset Forfeiture who would know, after years of working thousands of asset forfeiture cases, who is qualified and who is not.</u> The Appellate Prosecutor for Asset Forfeiture and the Asset Forfeiture Investigator work more closely together on a daily basis than the Asset Forfeiture Investigator and her supervisors do. The fact that Officer Troy Skaggs is still not able to conduct detailed, labor intense, involved investigations proves the Asset Forfeiture position is

much more specialized than the Defendants are alleging. Officer Troy Skaggs may be an expert on vehicles, however, that is significantly less than 5% of the Asset Forfeiture position. If this is what the interview panel based their decision on, this additionally shows the interview panel had no expertise in what the position actually consisted of. The Plaintiff was trained for 2 months by Officer Scott Jordan back in the end of 2002. Officer Troy Skaggs sat right beside Officer Scott Jordan for Officer Skaggs' first 3 years in Asset Forfeiture. Therefore, there can be no excuses for the lack of Asset Forfeiture training. The Asset Forfeiture account deposits/balances bear the brutal truth in the little work being done for over the past 3 ½ years.

The "interview panel" has been comprised both in 2012 and 2015 by supervisors vulnerable to the control of "higher ups". The police pension is attained after 20 years on the job and beginning at the age of 50. There was no one on the "interview panel" in either interview of 2012 or 2015 who met the pension requirements as of yet. Additionally, anyone over the rank of Lieutenant is no longer protected by the Police Union. The old cliche' "go along to get along" plays in the Peoria Police Department to make sure their (supervisors) futures are secure with take home cars in many positions and their continued employment. Therefore, it should not be any surprise to the Court that the Defendants provided affidavits from these people in this case. They are not only using their titles as leverage to the Court, but they are in danger of losing their positions and perks, such as take home cars, flex hours and plain clothes, by admission of any guilt. The Court finding that the female, Assistant Chief Lisa Snow, by her sex being female was a fair person in the interview room is simply not the case. Plaintiff has known Lisa Snow for several decades. Assistant Chief Lisa Snow has made it very clear to the Plaintiff and others that her loyalty is to Chief Settingsgaard for giving her her positions and promotions over the years.

The Defendants put much weight on the "interview panel" for the 2012 Asset Forfeiture interviews. Plaintiff felt that she did an outstanding interview not only in 2012 but also in 2015

even though Officer Troy Skaggs was chosen over her both times. The Defendants allege that Plaintiff's behavior was "bizarre" in the 2012 interview. Defendants go on about a 9 page document that the Plaintiff read. 1st of all, the Defendants fail to explain that for some reason, in this year (2012), and this year only, interviewees had to fill out a **"questionnaire"** for the interview panel prior to the interview. Because Asset Forfeiture is so specialized and complex, the Plaintiff didn't have enough room on the questionnaire form to fill out all of her duties and therefore covered her answers in the 9 page handwritten document so that she wouldn't forget anything. This again shows how specialized and complex asset forfeiture is. 2nd of all, the Defendants go on about the length of the document but typewritten out it is not even 2 pages. **See Plaintiff's interview attached from 2012.** There was no "bizarre" interview by the Plaintiff as the Defendants claim. She was well prepared and extremely thorough. Plaintiff was pleasant in both interviews and Plaintiff even made jovial points during both her interviews in 2012 and 2015. When asked what the most important part of asset forfeiture entails, Plaintiff answered "to successfully investigate cases and safeguard the money".

In addition to the 8/10/10 date of Plaintiff criticizing Chief Settingsgaard's reckless spending of $19,500.00 (for a video that he had made by a production company that he was featured in) the illegal GPS landed on the Plaintiff's vehicle <u>several hours later.</u> This is proven in the records of Asset Forfeiture expenditures for 8/10/10 and the records of the illegal GPS placed on Plaintiff's vehicle 8/10/10 just hours later.

The following month, September 2010, Plaintiff was denied her annual Asset Forfeiture training by Chief Settingsgaard because "it was too much money". This was very odd. Plaintiff knew there were hundreds of thousands of dollars in the Asset Forfeiture funds and knew continued Asset Forfeiture training is an encouraged expenditure from these funds where officers learn law updates and how to seize even more assets, which is more money for municipalities.

Ironically, the department has continued to send other officers and supervisors all over the U.S. for their specialized training by using the Asset Forfeiture funds and department monies.

In November of 2010, the secret videotaping of Plaintiff by Wilson was again discovered. Officer Wilson was immediately removed from the vice unit but allowed to keep his job and go immediately to patrol. This was the 2nd time Officer Wilson had been discovered using department equipment to target the Plaintiff secretly and for no justifiable reason.

Officer Troy Skaggs, then the Union President, accompanied Officer Wilson (who was no longer allowed in the vice office) back into the vice unit when no one was around. This happened within approximately a week of Wilson being kicked out. This among other things, like not taking Officer Wilson's keys immediately or changing the Vice door key pad lock number, contaminated the investigation. He was even allowed to keep his take home vehicle for several weeks. Additionally, all of the equipment Officer Wilson used in his position in Vice was not seized immediately in 2010 for the "in house" investigation. That is why it took nearly 3 months for the GPS tracking of the Plaintiff to be discovered. <u>The GPS was discovered on accident by a fellow co-worker who turned it in in February of 2011.</u> There was no thorough investigation done.

In a previous lawsuit against the City by a female, Judge Shadid had previously told Chief Settingsgaard that investigations like these should be taken outside the Peoria Police Department. This investigation was kept in house. Later in 2013, (then) Sgt. Kerrie Davis' investigation against the male sergeants was also kept in house.

Since Officer Wilson was allowed to be still employed, there were several times Plaintiff and Officer Wilson had run ins over the next several months. Each time the Plaintiff went to command officers and Chief Settingsgaard. Chief Settingsgaard kept minimized the stalking, even after the GPS was found to be on Plaintiff's vehicle. Chief Settingsgaard made odd comments to

Plaintiff such as "You are really letting this bother you. You should let it go. If you don't let this go, you will lose friends. It's not like you got raped or anything."

Due to the lack of protection given by the employer, the Plaintiff felt she had no choice but to get outside help from IDHR and seek a No Stalking Order by the courts.

An extremely important part of all of this, is when the IDHR conducted their investigation with Plaintiff, Chief Settingsgaard, Randy Ray (former City Corporation Counsel), Captain Scally, (then) Sgt. Mike Eddlemon, Officer Wilson, Officer James Feehan, (then) Sgt. Ken Snow and two attorneys all in the same room, <u>Captain Scally admitted there was a cleavage shot of the Plaintiff caught in the cameras recorded by Officer Wilson in 2010 targeting her.</u>

Much to the Plaintiff's surprise, the City of Peoria was now erroneously providing a defense team for Officer Wilson, paid by taxpayers. This was for the first stalking trial in 2011 and the first IDHR hearing. This billed out over $100,000.00 to the City of Peoria taxpayers. The Benevolent Union <u>contract language sites an exception of **65 ILCS 5/1-4-6** where no one was legally bound to provide expenses for a defense</u>. Union President, Officer Troy Skaggs, pushed it through anyway. Therefore, in 2011 it was paid by the City of Peoria. However in the 2013, the City of Peoria legal department (under new management) did not allow the defense to be paid by the city. Making the proper decision. In 2013, the Plaintiff lost the hearing in court and the "protection" of an extended no stalking order against Officer Wilson. That court did not allow evidence that had been discovered by the Plaintiff.

In 2011, a peculiar chain of events began to take place. Officer Troy Skaggs, the Union President at that time, was sending false messages to Plaintiff's (then) husband. At the time, Plaintiff could not understand this bizarre behavior and reasoning behind this. This type of meddling was way out of line to say the least. No one could make sense of this, unless it was to try and create problems in the Plaintiff's private life. But the reasoning was unknown at that

time. During this same time frame, a witch hunt of sorts was allowed against the Plaintiff. The Plaintiff's department phone was seized and taken for months during the 1st stalking trial. The Plaintiff's work computer was gone through. Other attacks on the Plaintiff were allowed, such as the high paid defense attorneys were subpoenaing all of Plaintiff's husband's business accounts and Plaintiff's personal bank accounts. None of the Plaintiff's private life had anything to do with this case whatsoever. At that time Plaintiff's personal finances were over $2,000,000.00 in assets and $1,000,000.00 of debt. Therefore, these unjust and unexplained attacks on the Plaintiff and her personal life certainly did not help Plaintiff's marriage. Which indeed the marriage did fall apart shortly after.

During the in house investigation of the stalking in 2011, <u>one of the department phones of the Defendants was found to be "erased"</u>. This was recently discovered during this current court case. This behavior is a re-occurring "coincidence" in the "in-house" investigations controlled by Chief Settingsgaard.

In 2012 the Plaintiff was targeted repeatedly by new supervisors to the vice unit. The Lieutenant transferred in has a history of not liking female officers. This is evident in the work reports and retaliation complaints made to IDHR and EEOC by the Plaintiff.

The timing of the aforementioned e-mails going back and forth between Plaintiff and Chief Settingsgaard over the spending of Asset Forfeiture money in 2011 for the rope houses that the Chief wanted to spend the money on (impermissible items) is another key to the timing of the "new rotation policy".

Once Plaintiff was removed from her position, (then) Sergeant Kerrie Davis, another female at the Peoria Police Department, was transferred to the "new Target Offender Unit". Ironically, when Sgt. Kerrie Davis questioned Chief Settingsgaard on why she was passed over (as the next one in line for Lieutenant), the very next day, Chief Settingsgaard had her being

investigated for going home on duty and the tool he used to prove his claim was yet another GPS. This time the GPS was a setting on her department phone. When Kerrie Davis brought forth information that other Sergeants, including (then) Sgt. Mike Mushinsky, who was in the same unit, were doing the exact same thing, the investigation was again kept "inside" the Peoria Police Department and controlled by Chief Settingsgaard. As in Plaintiff's case, Kerrie Davis' department phone was taken from her. Also as in Plaintiff's case, during this investigation, again <u>another department issued phone of one of the male sergeant's in question was "erased" in some "water damage" incident.</u> Additionally in the Kerrie Davis case, **Chief Settingsgaard had "lost" the investigation in the Kroger parking lot.** Yet again, after the Kerrie Davis investigation was complete, she was moved to patrol and <u>no wrong doing was found on the parts of the male sergeants</u>. Sergeant Mike Mushinsky was promoted to Lieutenant. He is currently the Lieutenant of the Target Offender Unit. In 2015 Lt. Mike Mushinsky was the highest ranking person in Plaintiff's 2nd (and again unsuccessful) try at interviewing for the Asset Forfeiture position.

      Evidence does show that Steve Settingsgaard is not a truthful person. Chief Settingsgaard was untruthful in a federal wrongful death lawsuit in Wisconsin just prior to coming to the Peoria Police Department. Evidence does show that Steve Settingsgaard most definitely contradicted himself in his deposition in this federal case. Plaintiff admits that she used to think Chief Settingsgaard was a good guy and that she, too, was fooled by who he really is.

      Getting involuntarily transferred to patrol from a specialized unit, with perks, is punishment for officers. The Defendants say there was no place to put the Plaintiff other than patrol. This is also untrue. The Chief of Police has the authority to 3V (which is a term used at the department to temporarily assign officers to any position the Chief wants) under the union contract, any officer, at any time. Officers have been 3V'd for long periods of time, many times over the years, even done by Chief Settingsgaard. In Chief Settingsgaard's own deposition he

admits Officer Wilson did these things to the Plaintiff and then Chief Settingsgaard moved Plaintiff to the same division as Officer Wilson.

The Defense is glossing over the "rotation policy" paperwork created in 2012 showing the entire vice unit was "transferred to Patrol" then later "reassigned to the new Target Offender Unit." No one ever left their desk. This is very misleading to someone on the outside looking in. Ironically, the <u>whole department re-organization simply boiled down to "SID/Vice" changing its name to "SID/Target Offender Unit"</u> and adding personnel so that they would be the "DON'T SHOOT PROGRAM" for the mayor. <u>The Plaintiff was the only female in the unit and the only one moved out of vice.</u> Defendant Steven Settingsgaard even tried to mix words and confuse readers, in his answer to the grievance the Plaintiff filed with the Union. Plaintiff held little hope of any help from Troy Skaggs, the Union President, who got the Plaintiff's Asset Forfeiture position. No other units underwent any change other than a few personnel transfers in and out.

In 2013, the Peoria Police Department was used to targeted then Councilman Dan Irving in the same manner. In 2015, the Peoria Police Department and City of Peoria was involved in the Twitter scandal brought on by the Mayor. Chief Settingsgaard used his power to put people in positions and give them perks of the job. He used them to do his bidding like the City Council meeting where the church people and the "Target Offender Unit" were at. Kerrie Davis reports the unit was told to be there and bring their families. The same Target Offender Unit who targeted Councilman Irving. The same Target Offender Unit who is in charge of the 'DON'T SHOOT PROGRAM' for the mayor. During this particular council meeting "support for Chief Settingsgaard", Officer Troy Skaggs, then Union President, (who previously had called for a vote of no confidence from the union membership against Chief Settingsgaard) spoke now in support of the Chief. Officer Skaggs additionally was given a radio interview with WMBD supporting the Chief. Shortly thereafter, Officer Troy Skaggs was no longer the union president by stepping down

after much controversy from the membership.  Around this same time frame, Chief Settingsgaard was given a radio interview with WMBD and stated something similar to *Donna Nicholson was never in the Vice Unit.*  The Plaintiff was assigned to the vice unit and her desk sat right in the middle of the Vice Unit for 10 years.

It is all connected.  There seems to be a lot of conflict of interest being ignored and done by the City of Peoria.  Officer Troy Skaggs has been providing security by chauffeuring around Caterpillar executives.  Additionally, the Peoria Police Department is currently having on duty officers provide security at the private residences of Caterpillar, Inc. VIP's due to the recent layoffs.

Unfortunately, in 2012, the Plaintiff and her husband went through a bankruptcy and ultimately a divorce.  The Plaintiff was blindsided that her husband was not paying the loans on the family businesses while they were having marital problems.  Unfortunately, in a marriage when one spouse isn't holding up their end of the bargain, the other spouse can get drug through very unpleasant circumstances and the Plaintiff had no choice in the bankruptcy.  The bankruptcy attorney can attest to the fact that the bankruptcy was in no way shape or form the Plaintiff's doing and the Plaintiff tried everything in her power to resist the bankruptcy.  Because of the bankruptcy, the Plaintiff's 1st federal lawsuit was not owned by the Plaintiff and the Plaintiff had no say so in any of those proceedings either or the ridiculous settlement.  Plaintiff pleaded repeatedly with the bankruptcy attorney assigned to the case, not to settle the 1st federal lawsuit.  That attorney, named Joel Handler, struck a deal with the city and settled it anyway.  The City initially tried to have **all of this** evidence squashed in that settlement.  Plaintiff was never given any money from the low settlement and still nothing was done to Officer Wilson by the City of Peoria even after all the media attention to this case.  For the record, Plaintiff has never received

any money for anything involving these cases. She has had to provide for her legal representation on her own.

Regardless of the 1st federal case being "settled", that <u>does not mean that the damage to the Plaintiff has stopped.</u> The emotional level of this case has been a nightmare. A person just doesn't "get over" something like this. The Plaintiff every single day has to deal with the effects of being a victim of stalking, not getting protection from the Police Administration or the City, the case being "unsolved", Officer Wilson not being disciplined, the City continually funding the defense with taxpayer money, her professional reputation being attacked, her successful career derailed in Asset Forfeiture. Everyone agrees that Plaintiff was subjected to extreme unusual and disturbing behavior by Wilson, but it was not because of what the Plaintiff did wrong, <u>it was because of what Chief Settingsgaard was covering up.</u> After Plaintiff was removed from Vice, the Plaintiff went to night shift patrol so that she wouldn't encounter Wilson or the police administration who were targeting her to silence her. The Plaintiff is forced to work in a marked squad, in full uniform with a GPS and video camera. Plaintiff has interviewed on 4 occasions to get an investigator position since being transferred to patrol but Plaintiff remains assigned to patrol. There is nothing worse for a victim than to get no justice when injustice is done.

Plaintiff repeatedly went to Chief Jerry Mitchell (then Assistant Chief), Assistant Chief Lisa Snow (then Captain), Retired Assistant Chief Mike Eddlemon (then Sergeant then Lieutenant then Captain then Assistant Chief and now working a job that Settingsgaard got for him after Settingsgaard went to Caterpillar, Inc.), Captain Scally, Captain Marion (then Sergeant, then Lieutenant), Lieutenant Mike Mushinsky (then Sergeant), Lieutenant Doug Theobald (then demoted to Sergeant but now Lieutenant again), Lt. Shawn Wetzel (former 3rd shift Lieutenant and now Lieutenant of Internal Affairs) asking for help and protection from the ongoing and absolutely unnerving stalking, discriminating and retaliaton situations. Just days before Wilson

was retained by Chief Settingsgaard, **<u>Assistant Chief Lisa Snow (then Captain) assured Plaintiff (at lunch at Red Lobster) that Officer Wilson would be fired because her husband, Lieutenant Ken Snow (then Sergeant of internal affairs), had enough evidence against him.</u>** But, that didn't happen. Officer Wilson was not only retained, but also given NO DISCIPLINE FOR THE VIDEO TAPING, LYING OR THE GPS. After Officer Wilson was retained hardships fell on the Plaintiff's so-called "friendships" with any and all life-long colleagues aforementioned because the Plaintiff could no longer trust any of them to do the right thing. Mike Eddlemon told Plaintiff that Chief Settingsgaard was counting on Officer Wilson and Plaintiff having so much conflict between them about this stalking to destroy each others careers. Mike Eddlemon also told Plaintiff that Chief Settingsgaard was throwing so much at Plaintiff to make Plaintiff merely look like a constant whining female. Mike Eddlemon also told Plaintiff several times to "just let it go" even when he was the Assistant Chief and Steve Settingsgaard was no longer employed by the City. Defense brings up that (then) Sgt. Loren Marion came to Plaintiff's home for daughter's graduation several years ago. Sgt. Marion was Plaintiff's direct supervisor and the unit as a whole was invited. The Plaintiff, at that time, did not have all the facts to this federal case. In mid 2012, Sgt. Loren Marion gave Plaintiff one of the worst work reports she had ever gotten. Then in October of 2012, Sgt. Loren Marion was allowed to do an informal investigation for his own friend, Officer Wilson, when Wilson again violated the no stalking order. Sgt. Marion found no wrong doing by Officer Wilson. Officer Wilson was allowed, through (then) Asst. Chief Jerry Mitchell, as the complainant, to have Lt. Ken Snow do a formal investigation against Plaintiff in 2012 which was unfounded. Sgt. Mike Mushinsky was allowed to gossip freely with false information about Plaintiff to the sergeants and subordinate officers of his unit beginning in 2013, see Kerrie Davis' deposition. Once Plaintiff was removed from her Asset Forfeiture position, (then) Sgt. Mushinsky and (then) Lt. Mike Eddlemon were telling the unit that Plaintiff

had "this secret slush fund" of money in an attempt to make the Plaintiff look like she couldn't be trusted around money. This was not true and they knew it. There was an overage account at CEFCU under the Peoria Police Department's name (with no personal ties to the Plaintiff) which was a result of 10 years and thousands of forfeited cases where extra money would turn up in cases due to innocent errors of officer's being off on their count. The money was forfeited but abandoned and Plaintiff and the Comptroller for the City, Jim Scroggins, created the non-interest bearing account so it could be safeguarded and recorded. The supervisors were "acting like this was news to them and some secret account had been found after Plaintiff was removed". This was completely false and shows: 1. their continued witch hunt and attacks on Plaintiff, 2. it was never a secret and the money was even brought up in Plaintiff's 2012 interview statement, 3. how little they were experts in procedures in asset forfeiture, and 4. the Plaintiff had more money in the accounts and no money was missing. Plaintiff in an e-mail to Captain Scally and (then) Captain Lisa Snow requested a full audit when she was transferred out so that there was never a question about her integrity. Not only was an audit not done, the request was ignored without answer.

    The Defendants and other command officers all stuck together regardless of what the evidence and facts bear. Their affidavit's are bias. They have gone to great lengths to try and make the Plaintiff look wrong. Plaintiff has a good working relationship with her co-workers of the same rank. Right before Plaintiff went to her interview for the 2nd time in 2015 for the Asset Forfeiture position, officers were joking with her saying "how does it feel to go interview for a position you are the only one qualified for, knowing you aren't going to get it before you walk in the door".... That's how obvious it is.

    In 2015, with Lt. Mike Mushinsky as the highest ranking person in the Asset Forfeiture interview, how could the Plaintiff possibly have a fair chance? Plaintiff feels they had to "save face" of their last decision of poor judgment by choosing Troy Skaggs and didn't want to "look

wrong" by putting Plaintiff back in the position. Plaintiff and Troy Skaggs were the only two who put in for the position in 2015. Additionally, there are currently no females in the 23 man Target Offender Unit.

In the end of 2012, Ron O'Neil, a City of Peoria Attorney, called Plaintiff's attorneys who handled the successful no stalking order in 2011. Ron O'Neil requested the attorneys have Plaintiff cancel the no stalking order against Officer Wilson since both would be in patrol together beginning 2013. The request was ridiculous. Ron O'Neil spoke to Plaintiff on the phone in April of 2013 wanting to meet with her. Plaintiff had no legal representation at that time due to her last attorney getting a job with the U.S. Government and leaving the firm. Plaintiff told Ron O'Neil she did not want to meet without legal representation. Ron O'Neil assured the Plaintiff that he had read through all the evidence in the case and did, in fact, agree and believe that the Plaintiff was stalked illegally and wanted to talk about that. Plaintiff was apprehensive about any meeting with the city or even being at city hall because she did not trust that they would not be secretly recording her. Plaintiff considered a meeting over a length of time, but ultimately decided not to meet with Ron O'Neil. When Plaintiff told Ron O'Neil she decided not to meet with him, he cussed her out and told her she was crazy for thinking there would be secret video recordings. (Plaintiff found out recently that Officer Jeffrey Wilson admitted to the media that he indeed put hidden video cameras in City Hall for Chief Settingsgaard.) The Plaintiff's feeling was correct. She could trust no one. Ron O'Neil additionally contacted the federal EEOC investigator in Chicago who was handling the Plaintiff's claim. Ron O'Neil, just like Chief Settingsgaard, minimized what was going on in the Peoria Police Department. Regardless, the EEOC investigator saw right through it. Ron O'Neil also had something to do with the bankruptcy settlement done without the Plaintiff's knowledge or consent since the Plaintiff did not have a say so in it. Ron O'Neil was trying to have the language of the settlement cover any and all future claims by the

Plaintiff to where the Plaintiff could never sue the City again. In 2013, Ron O'Neil told Kerrie Davis during her complaint against the City that the other female officer complaints were "bullshit." In 2013 when Plaintiff sought (and lost) an extended no stalking order, Ron O'Neil helped the defense team for the City of Peoria in court.

In this day and age of City's financial hardships. It makes no sense to remove an employee (Plaintiff) who was doing a good job bringing in large amounts of money for the department. Then 3 years later in 2015, only the Plaintiff and Troy Skaggs applied for the Asset Forfeiture position and yet again the Defendants retain Officer Troy Skaggs when clearly the work isn't getting done. His supervisor, Lt. Mike Mushinsky, provides an affidavit in this case. The same Lt. Mike Mushinsky who was allowed to gossip falsely about the Plaintiff to his unit and tarnish the Plaintiff's reputation unjustly. The same Mike Mushinsky who was the subject of the Kerrie Davis investigation. This is constant retaliation to the Plaintiff.

Looking at the public entities, like a school district, when there is improper videotaping the 1st time, people lose their jobs. In this case as well, the 1st time this happened, it should have been the end of the story. This case is the definition of corruption, cover-up, discrimination and retaliation because the Plaintiff, a female, spoke up. Any workplace where illegal behavior is condoned, intimidates the rest of the employees into silence. Police officers are expected and absolutely have to be trusted public officials.

**_The whole point to this federal lawsuit, is NO ONE to date has done anything about any of this. No one has been held accountable. There has been no consequence._** The City of Peoria has mastered stall tactics, throwing red herring after red herring, dumping thousands of pointless documents into the mix, using large amounts of taxpayer money to pay attorneys, trying to hide the truth from the public, trying to silence and turn the problem around on the Plaintiff (that she did "something" wrong), calling any female who stands up to them *"crazy"*. All these

years, the Plaintiff has had to play by the rules and the City has not. Plaintiff believes the City is just waiting for that one chance where she messes up so they can fire her.

The Chief made excuses regarding the GPS in that there wasn't enough evidence to prove. **The state stalking court said otherwise. The appellate court said otherwise. The federal EEOC said otherwise.** The years of illegal secret video taping, in and of itself, is enough to fire somebody and criminally charge them... the GPS isn't even needed it is simply more compelling evidence.

**The City of Peoria has gone to great taxpayer expense (and still is with the current defense attorney) to cover up all of this.** Plaintiff has never filed a formal complaint before this case began in 2010. Plaintiff waited 6 months for the Defendants to do the right thing before she sought outside agencies for help. For what purpose has this gone on for 6 years... unless former Chief Settingsgaard and the City of Peoria were indeed involved. This is the Plaintiff's last chance for any justice. Plaintiff has been a professional investigator for over 25 years as a Peoria Police Officer. Plaintiff only wanted the stalking to stop and a professional and proper investigation. Instead, she was targeted over and over due to the crimes and cover up by the Defendants. Plaintiff found herself in a 6 year battle for justice with no compensation for any proceedings that she has had to file to seek protection and justice from the illegal crimes, cover-up, discrimination, retaliation and corruption brought on by Chief Steven Settingsgaard, the Peoria Police Department and the City of Peoria.

Having an unsolved covered-up stalking case along with discrimination and retaliation triggers anxiety, feelings of betrayal, hardships and failure to trust for the Plaintiff. A woman should never be subjected to this type of treatment by anyone, especially an employer. Stalking is hard for males to understand until Plaintiff gives the example of "their wife, girlfriend, daughter, mother, sister, granddaughter, etc." going through something like this. It is painfully emotional,

traumatic and the physical and mental stress to a person is hard to put into words. Couple that with the discrimination and retaliation for simply doing her job. Plaintiff and her family have suffered tremendously physically, emotionally and financially.

All of this information is true. Plaintiff prays the Court finds this new evidence along with all the other evidence already entered in this case to be considered and Plaintiff believes all the evidence is relevant in <u>proving the patterns for years and non-stop targeting</u> and is sufficient for this Motion to Reconsider.

Plaintiff can no longer pay the expense of attorneys to represent her and requests the Court's latitude as to the guidelines of this filing for Request for Motion to Reconsider filed on her own behalf. Plaintiff is just a lay person. Plaintiff will be filing an affidavit in the near future.

This may all seem unbelievable to the Court, but it is true and correct. It happened. It happened to me.

**Plaintiff requests Defendant's Motion for Summary Judgment is Reconsidered by Honorable Judge Mihm and Defendant's Motion for Summary Judgment is Denied.**

Respectfully submitted,

*/s/ Nicholson*  9/9/16
Donna S. Nicholson, pro se